## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| PHILIP SCHOUWEILER, | Civil No. 13-268 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| CNS CORPORATION and OZARK LIFE INSURANCE COMPANY, | |
| Defendants. | |

Ken D. Schueler, **DUNLAP & SEEGER**, 206 South Broadway, Suite 505, Rochester, MN 55904, for plaintiff.

Larry W. Joye, **STINSON LEONARD STREET**, 1201 Walnut Street, Suite 2900, Kansas City, MO 64106, for defendants.

This dispute arises out of several noncompete agreements between Plaintiff Philip Schouweiler and his former employers, CNS Corporation ("CNS") and Ozark Life Insurance Company ("Ozark") (collectively, "Defendants"). Schouweiler brought this action after Defendants advised him that his entitlement to various post-employment sources of compensation was terminated, on the grounds that he breached the noncompete agreements. Schouweiler, in contrast, contends that Defendants were the first to breach the various agreements by prematurely withholding commission payments without sufficient proof that he had violated the noncompete agreements. Schouweiler now moves for summary judgment on his claims for breach of contract, unjust enrichment, and declaratory judgment. The Court will deny Schouweiler's motion because there are facts upon which a reasonable jury could conclude that Defendants did

not breach the agreements by temporarily withholding commission payments, or that, even if they did, any such breach was not material.

## BACKGROUND

CNS employs agents who sell life insurance policies and mutual funds. (Aff. of David Melton ¶ 7, May 7, 2014, Docket No. 36.) CNS has three subsidiaries: Ozark, N.I.S. Financial Services ("NIS"), and Sharpe Holdings. (Aff. of Ken D. Schueler, Ex. A (Dep. of David Melton ("Melton Dep.")) at 15, April 2, 2014, Docket No. 27.)

## I.     SCHOUWEILER'S HISTORY WITH CNS

Schouweiler began his employment with CNS as an agent in 1985 and continued for approximately 24 years until he was formally terminated by letter effective September 2009. (Schueler Aff., Ex. B (Dep. of Philip Schouweiler ("Schouweiler Dep.")) at 25, 67, Apr. 2, 2014, Docket No. 27.) During his time at CNS, Schouweiler was promoted several times to various managerial positions and eventually became a territory vice president. (*Id.* at 26-28.) In 2003, due to a decline in production in Schouweiler's area at Ozark, he stepped down as territory vice president and became a regional manager. (*Id.* at 30-31.) In 2005, Schouweiler was further demoted to an agent, along with the four other managers remaining in Minnesota. (*Id.* at 32.)

### A.     Employment Contracts

Schouweiler signed a number of employment contracts during his employment with CNS. On July 1, 1987, he signed an Agent's Contract with NIS that governed his

Ozark insurance sales commissions.  (*Id.* at 55; Schueler Aff., Ex. B (NIS Corp. Agent's Contract ("Agent's Contract")) at DEF_00022.)[1]  On June 30, 1992, as a requirement for being promoted to manager, Schouweiler signed a manager's addendum to the Agent's Contract.  (Schouweiler Dep. at 105; Schueler Aff., Ex. B (NIS Corp. Addendum to Agent's Contract for Managers ("Manager's Addendum")) at DEF_00059.)  On Jan. 1, 1995, as a requirement for being promoted to zone manager, he signed another addendum for zone managers.  (Schouweiler Dep. at 104-05; Schueler Aff., Ex. B (NIS Corp. Addendum to Agent's Contract for Managers ("Zone Manager's Addendum")) at DEF_00053.)  He also signed a Sales Representative's Contract with NIS on July 1, 2004 related to his relationship with and compensation from NIS. (Schouweiler Dep. at 95; Schueler Aff., Ex. B (NIS Financial Services, Inc. Sales Representative's Contract ("Sales Rep. Contract")) at DEF_01162.)  Pursuant to each of these employment contracts, Schouweiler was entitled to certain commissions from his insurance and investment sales, with his right to such commissions continuing upon termination of his employment as long as the revenue from the sales continued for the company.  (Agent's Contract ¶ 9; Manager's Addendum ¶¶ 6-7; Zone Manager's Addendum ¶¶ 6-7; Sales Rep. Contract ¶ 8; *see also*, Schueler Aff., Ex. C (Dep. of Charles Sharpe ("Sharpe Dep.")) at 30.)

Each of these agreements contains essentially the same non-competition provision.  (*See* Agent's Contract ¶ 21; Manager's Addendum ¶ 9; Zone Manager's Addendum ¶ 9;

---

[1] In referring to record evidence, most of which is under seal, the Court refers to the internal pagination of depositions, and to all other documents by their identification numbers in the lower right corner.

Sales Rep. Contract ¶ 18.)  The provision includes a three-year replacement of business provision, which prohibits Schouweiler from directly or indirectly, for himself or on behalf of any other person or entity: (1) inducing or attempting to induce any policyholder of Ozark or CNS or any owner of Fund Shares to cancel, surrender, apply for a policy loan under or discontinue the payments of premiums on any policy issued by Ozark or CNS or to sell any Fund Shares or transfer such person's account with NIS to another broker/dealer and (2) contacting, soliciting or selling a policy of insurance to any person who is or was a policyholder of Ozark or CNS or selling securities to any person who is or was an owner of Fund Shares within the three years following the termination of the contract.  (*See* Agent's Contract ¶ 21; Manager's Addendum ¶ 9; Zone Manager's Addendum ¶ 9; Sales Rep. Contract ¶ 18.)  It also includes a non-solicitation provision, which prohibits Schouweiler from engaging in or becoming interested in, affiliated or connected with any activity or business that competes with the business of Ozark, CNS, or NIS for one year following the termination of his employment; this provision applies only to activities in the county or counties Schouweiler solicited insurance for Ozark or Fund Shares for NIS.  (*See* Agent's Contract ¶ 21; Manager's Addendum ¶ 9; Zone Manager's Addendum ¶ 9; Sales Rep. Contract ¶ 18.)

The agreements state that a violation of the noncompete provision results in the automatic termination of the employee's right to commissions from Ozark and NIS. (Agent's Contract ¶ 9(h); Manager's Addendum ¶ 8; Zone Manager's Addendum ¶ 8; Sales Rep. Contract ¶ 8(e).)  "The contracts are designed in such a way that breach of one contract . . . creates a cascade failure breach of the other contract, and so they're

deliberately designed to coordinate between the two clauses." (Melton Dep. 74-75.) Thus, if Schouweiler breaches one noncompete provision, he loses his right to commissions under all of the contracts.

### B.    The Equity Participation Plan

Another contract into which Schouweiler entered during his employment was the CNS Equity Participation Plan ("EPP"). (Schueler Aff., Ex. B (CNS Corporation Equity Participation Plan as Amended and Restated ("EPP")) at DEF_00001.) The EPP is a deferred compensation plan governed by ERISA and established in part to "create an incentive for the Participants to provide their best efforts on behalf of the Corporation." (*Id.* ¶ 1.) Participants earn unit credits to their EPP accounts annually based on performance criteria established by CNS including, for example, sales levels, sales goals for a particular year, and performance standards. (*Id.* ¶ 3(a).)

Under the terms of the EPP, payment of the Participant's earned units commences upon the Participant's "Retirement Date," defined as the earlier of "(i) the Participant's 30th anniversary with the Corporation . . . (ii) the Participant's 25th anniversary with the Corporation . . . if such 25th anniversary is on or after the Participant's 55th birthday; or (iii) the Participant's 62nd birthday." (*Id.* ¶ 6(d).) Schouweiler started his employment at CNS on May 20, 1985 and was formally terminated in September 2009, (Schouweiler Dep. 67), so he missed the twenty-five years with the company commencement date by just over a year. Thus, Schouweiler's 62nd birthday is the proper commencement date, which, according to CNS records, falls on September 19, 2022. (Melton Aff. ¶ 15.)

To obtain the benefits of the EPP, employees must first make a benefits claim. (*See id.*, Ex. 2 ("EPP Claims Review Procedure") at 1; *see also id.* ¶ 18.)  If that claim is denied, the EPP contains a written procedure for review of a denied claim for benefits, the EPP Claims Review Procedure, which states:

> If the Participant's claim is denied or deemed denied, and the Participant wants to submit the claim for review, the Participant . . . may file a claim for review, in writing, with the Administrator . . . in accordance with the following procedures.
>
> (a)  The claim for review must be filed with the Administrator no later than 60 days after the participant has received written notification of the denial of the participant's claim for benefits, or if no written denial was provided, no later than 60 days after the deemed denial of the claim.

(EPP Claims Review Procedure 2 (emphasis omitted).)

The EPP also contains a noncompete provision.  Section 6(e) provides that a Participant automatically forfeits "all unpaid Initial and Aggregate Unit Value upon the occurrence of any of the following events:"

> (i) if the Participant, either while associated with, or within three (3) years after the Participant's Termination of Association with, the Corporation or its Affiliates, without consent of two-thirds (2/3) of the entire Board of Directors of the Corporation, engages in the sale of life insurance on behalf of another insurer in that portion of the geographic market area for which the Participant was responsible while associated with the Corporation or its Affiliates.
>
> (ii) if the Participant uses trade secrets (such as policyholder lists) or attempts to replace business for the benefit of another insurer or brokerage firm while associated with, or within three (3) years after the Participant's Termination of Association with, the Corporation or its Affiliates.

(EPP ¶ 6(e).)

As of December 31, 2008, Schouweiler's EPP account was valued at $1,236,499. (Sharpe Dep., Ex. 62 to the Dep.)  There is no evidence of Schouweiler having made a claim for benefits for the funds in his EPP account.  (Melton Aff. ¶¶ 17-18.)

### C.      Schouweiler's Termination and Post-Termination Employment

Schouweiler's production for Defendants significantly declined during 2008 and 2009.  (Schouweiler Dep. 44-45; *see also* Melton Dep. 28-29.)  Schouweiler says that at that time he began "checking out because of [his] feeling towards the direction that the company had decided to take."  (Schouweiler Dep. 37; *see also* Melton Dep. 35.)  In 2008, in addition to continuing his work as an Ozark/NIS agent, Schouweiler began working as a community relations director for a wind farm company where his wife had been working since 2007.  (Schouweiler Dep. 33-34, 45.)  When Schouweiler began with the wind farm company he worked there 20 hours per week, but by the end of 2008 it was a full-time position.  (*Id*. at 34-35, 37.)  During this time, Schouweiler's production with Ozark went from an average of $85,000 a year to approximately $5,000 by 2009.  (*Id.* at 44, 133-34.)

On August 10, 2009, Schouweiler received a termination letter from Defendants giving him notice of his termination effective in thirty days.  (Schueler Aff., Ex. B at DEF_01026.)  The company cited Schouweiler's decrease in productivity and lack of attendance at mandatory sales meetings as reasons for terminating his employment.  (*Id.*)  Defendants continued to directly deposit Schouweiler's commissions into his bank account after his termination.  (Melton Dep. 104.)

In late October 2010, the wind farm company reduced Schouweiler and his wife's hours to eight hours per week, which caused a significant decrease in their salaries. (Schouweiler Dep. 45.)   As a result, in January 2011, Schouweiler returned to the insurance and securities business.  (*Id.* at 46-48.)  Schouweiler stopped working for the wind farm company entirely in May 2011.  (*Id.* at 45)  Since he returned to the insurance and securities business in January 2011, Schouweiler has worked for or sold life insurance or securities for a number of entities.  (*Id.* at 46-50, 53-54.)  Among them is Mid-American Financial Group, an affiliate of New England Financial, for which he worked from January to May 2011.  (*Id.* at 46-47.)

### D.      The March 2011 Temporary Hold on Schouweiler's Commissions

On March 8, 2011, Schouweiler stopped receiving his commission payments from Ozark and NIS.   (Melton Dep. 104-05.)   Defendants did not give Schouweiler any notification or explanation as to why his commissions were withheld at this time.  (*Id.* at 112-13.)   Unbeknownst to Schouweiler at the time, Thomas Determann, co-agency director of Ozark and NIS, had directed the relevant agency to discontinue Schouweiler's commissions.  (Schueler Aff., Ex. D (Dep. of Thomas Determann ("Determann Dep.")) at 14.)   Determann and Joe Harrish (another co-agency director) made the decision to withhold Schouweiler's post-termination commissions on March 7, 2011, based on information about client accounts which had been transferred out on March 3, 2011. (Melton Aff. ¶¶ 20-25.)  The withholding was temporary, until Determann and Harrish

- 8 -

received further information and input from Defendants' counsel, David Melton. (Melton Aff. ¶ 20; *see also* Determann Dep. 15.)

The record provides additional background as to Defendants' reason for the withholding.  On March 7, 2011, the day before Schouweiler was to receive his commission deposit, Melton sent an email to paralegal Jodi Coen explaining why they were holding Schouweiler's accounts:

> I told Kristin earlier to have Carol Boone research each of the moved accounts to verify that they are not Phil's family accounts.  If any of them are non-family members, Carol will get the info to you.  You need to forward the info to Larry Joye for a warning letter for him breaching the covenant not to compete.  Phil has a LOT of money on the line since he was one of the guys who has a large amount in his EPP account.

(Schueler Aff., Ex. F.)   On March 14, 2011, almost a week after withholding Schouweiler's commissions, Melton then wrote the following email to Betsy Ross in Ozark accounting:

> We are continuing to research whether the flipping of accounts/policies is more widespread or whether this is an isolated instance.  In the meantime, we are holding Phil's checks.

(*Id.*, Ex. E.) In his deposition, Melton explained that Schouweiler's commissions were withheld because:

> [w]e started seeing a pattern of mutual fund transactions that were being transferred out and the information, like I said, was percolating up through our agents that there were some replacements that were going on.  I can't give you names.  I just ended up hearing that there were replacements that were going on.  It was reaching beyond Phil replacing his policy or [his wife]'s policy or his kid's policies.

(Melton Dep. 105.)    According to Defendants, when an agent begins to breach noncompete obligations, "the company can lose a substantial amount of business in a

very short period of time without being able to detect this because it does not know where the lost account has gone or who took the account." (Melton Aff. ¶ 19; *see also* Melton Dep. 107.)

On March 28, 2011, David Sandberg, an attorney for Schouweiler, sent Ozark a letter asking why Schouweiler was not receiving his commissions. (Melton Dep. 114-15.) Melton responded, "[O]ur basis for stopping the payment of Mr. Schouweiler's commissions is related to his breach of NIS Financial Services, Inc., sales representative contract." (Schueler Aff., Ex. A at DEF_01044 (emphasis omitted).) Melton also indicated that he had "very good reason to believe Schouweiler [wa]s in breach of the agreement," and that:

> NIS Financial Services and Ozark National Life Insurance Company are conducting an audit of the policies and accounts with which [Schouweiler] was entrusted. As far as we are concerned, the question is not if he violated the terms of his contracts, but rather the extent to which he has violated the terms of his contracts and what the proportional response of our Companies will be. Please note that a proportional response is not contractually required, but is a matter of grace with our Companies. If your client wishes to litigate, he will be held to the strictest terms of the contracts. The choice is his.

(*Id.*) After sending this letter, Melton "compiled a list of securities customers that ha[d] been transferred to New England Securities and some of the others," which led him to conclude that "there was replacement of securities business going on." (Melton Dep. 123-24.) Based on this audit, Melton concluded that Schouweiler had replaced or

solicited business from people other than his immediate family.[2]  (*Id.* at 126-27.)  Melton explained to Ross in an email he sent the same day that "[w]e haven't found any widespread looting.  Yet."  (Schueler Aff., Ex. H at P_00178.)  In another e-mail he sent to Determann that same day, he said, "FYI.  We've only been able to find that one instance.  We are releasing next payroll." (*Id.*, Ex. H at P_00177.)

On May 23, 2011, approximately two and a half months after initially withholding Schouweiler's commissions, Melton ordered that the commissions be reinstated. (*Id.*)  The total amount of CNS commissions that had been temporarily withheld was $3,929.90.  (Melton Aff. ¶ 27.)

### E.   Alleged Transfers Schouweiler Made Prior to the March 8, 2011 Withholding of His Commissions

The record contains some evidence of the accounts which Defendants believed to be transferred by Schouweiler in violation of the various noncompete provisions.  The parties do not dispute that on January 27, 2011 Schouweiler transferred his daughter's and grandson's NIS Pioneer Investment Accounts to New England Securities.  (Schueler Aff., Ex. I.)  However, the parties do dispute whether Schouweiler was the agent who transferred the accounts of Brett Cravath, who is not a relative of Schouweiler, on March 3, 2011 – five days before Defendants put a temporary hold on Schouweiler's commissions.  Defendants point to the following circumstantial evidence as proof that Schouweiler acted as Cravath's agent for the March 3, 2011 transfer of his accounts:

---

[2] Melton stated that Defendants "wouldn't enforce the covenant on" transfers for Schouweiler's immediate family, but that "if he went beyond that, then all bets were off and it would be we would come down with the full force of the covenant."  (Melton Dep. 126-27.)

- Brett Cravath's accounts were transferred from Defendants' company to New England Securities on March 3, 2011. (Melton Aff. ¶ 21.)

- Schouweiler had been Cravath's representative for his account with Defendants, as well as another customer, Matthew Romstad, who was also later transferred to New England Securities. (Melton Aff. ¶ 21; *id.*, Ex. 3.)

- At the time Cravath's accounts were transferred, Schouweiler worked for Mid-America Financial, an affiliate of New England Securities. (Schouweiler Dep. 46; Joye Aff., Ex. E at 9; Melton Aff. ¶ 23.)

- Schouweiler had already transferred his daughter's and grandson's accounts to New England Securities, (Schueler Aff., Ex. I), and Schouweiler identified New England Securities as an entity for which he sold products after his termination from Ozark and NIS. (Joye Aff., Ex. E at 9.)

- During discovery, Schouweiler produced an undated Mid-American Financial Group Client Information Form for Cravath. (Melton Aff., Ex. 5.)

- Additionally, Schouweiler represented Cravath on two later transfers of Cravath's mutual fund account; one on or about November 29, 2011, and another some time after that. (Schouweiler Dep. 163; Melton Aff., ¶ 22.)

### F.     The August 2012 Permanent Cancellation of Schouweiler's Commissions

In March 2012, Ozark representative Alan Rieke received a notice of cancelation with regard to Ozark/NIS customer Lynn Gaber. (Schueler Aff., Ex. J (Dep. of Alan Rieke ("Rieke Dep.")) at 21-24.) Rieke contacted Gaber to determine why she made the decision to discontinue her business and whether anything could be done to save her business. (Joye Aff., Ex. D (Dep. of Lynn Gaber ("Gaber Dep.")) at 14-15.) Gaber stated that she and Schouweiler had been in touch, at the behest of her son, about different investment options from those she had with Ozark. (Gaber Dep. 10-14; *see also* Schouweiler Dep. 170-73.) Gaber had been a customer of Ozark for approximately thirty

years and had always been represented by Schouweiler in some capacity prior to his termination from Ozark.  (Gaber Dep. 8-9.)  She met with Schouweiler for the first time since his termination in March 2012 to discuss the products he had to offer.  (*Id.* at 12-13.)

Rieke contacted Melton after his meeting with Gaber and advised him that a replacement had occurred with Gaber and that Schouweiler's name was on that replacement.  (Rieke Dep. 29, 34.)  Melton referred the matter to Larry Joye, Ozark's outside counsel.  (Melton Dep. 162.)

In August 2012, Defendants terminated Schouweiler's commissions, citing Section 9(e) of the Agent's Contract and Section 8(d) of both the Manager's Addendum and the Zone Manager's Addendum based on his breaches of the noncompete provisions. (Melton Aff. ¶ 29.)  CNS also "advised Schouweiler that his interest under the EPP had been automatically forfeited pursuant to and based on his breaches" of the noncompete provision in the EPP.  (Melton Aff. ¶ 29.)  Although he denied contacting or soliciting any Ozark policyholders during the three years following the termination letter in August 2009, Schouweiler admitted in his deposition that he had sold insurance policies to approximately twenty-five former Ozark policyholders.  (Schouweiler Dep. 67-68.)

## II.    THIS ACTION

Schouweiler brought this action on February 1, 2013, alleging three counts against Defendants:  Count I for breach of contract by refusing to pay him both commissions and compensation under the EPP, Count II for unjust enrichment by their retention of the

services Schouweiler provided to them without paying him compensation he is due, and Count III for a declaratory judgment that he is entitled to the "full compensation afforded him in various agreements with CNS and Ozark." (Compl. at 2-3, Feb. 1, 2013, Docket No. 1.) Defendants filed a counterclaim with their answer, alleging that Schouweiler breached the Agent's Contract by, among other things, "induc[ing] or attempt[ing] to induce policyholders of Ozark to cancel, surrender, or discontinue the payment of premiums on their Ozark policies." (Answer to Compl. and Countercl. at 9-10, Mar. 15, 2013, Docket No. 12.) Schouweiler now moves for summary judgment.[3]

The heart of this dispute is about which party – Schouweiler or Defendants – breached the various agreements between them first. Schouweiler argues that Defendants were the first to breach because they withheld his commissions in 2011 before having any evidence that he had violated the noncompete provisions (which he maintains that he did not), and that this excused him from his obligations under the various agreements going forward. Schouweiler's position is thus that he is entitled to both all of his remaining commissions and the funds in the EPP account, regardless of his insurance sales activity during the three years following September 2009. Defendants argue that there are genuine issues of material fact as to first, whether Defendants' temporary withholding of commissions was a breach of the agreements or warranted because Schouweiler

---

[3] It is not entirely clear whether Schouweiler intends to move for summary judgment on all his claims or merely the breach of contract and declaratory judgment counts. Schouweiler does not make arguments specific to his unjust enrichment claim in his motion for summary judgment. To the extent that this claim is part of his motion, the Court concludes that, without further argument or evidence in support of summary judgment on this claim, summary judgment on Schouweiler's unjust enrichment claim is not appropriate at this time.

transferred accounts of former Ozark policyholders, and second, if the temporary withholding was a breach, whether any such breach was material such that it excused Schouweiler from further obligations under the agreements.  Defendants further argue that the temporary withholding of commissions did not breach the EPP, and thus did not excuse Schouweiler from obligations under that agreement specifically.  They also argue that Schouweiler is required to exhaust the EPP's contractual administrative remedies before bringing suit, such that his request for a declaration as to his rights under the EPP is not ripe.  The Court concludes that a reasonable jury could find either that Defendants had a sufficient basis upon which to temporarily withhold Schouweiler's commissions such that they did not breach the agreements, or that any such breach was not material. Thus, the Court will deny Schouweiler's motion for summary judgment.  Because the Court will deny the motion for summary judgment, it need not address at this time what the legal implications would be of a finding that either Schouweiler or Defendants were the first to breach the various agreements, although it comments briefly on the possible implications with regard to the EPP.

## ANALYSIS

### I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49).

## II.    WITHHOLDING OF COMMISSIONS AS MATERIAL BREACH

Schouweiler argues that Defendants are barred from enforcing the noncompete agreements because Defendants first breached the employment contracts by withholding his commissions in early 2011. Defendants argue that summary judgment on this issue is not warranted because the withholding of commissions was not a breach, but rather authorized by the agreements because Schouweiler violated the noncompete provisions by recruiting customers (particularly Cravath) to transfer investments away from Defendants within three years of the last date of his employment. Defendants further argue that, even if Schouweiler had not first violated the noncompete provisions such that

Defendants' withholding was a breach, it was not a material breach, does not entitle Schouweiler to damages, and did not excuse him from further obligations under the agreements.

Missouri "recognize[s] the general principle of contract law that '[a] party to a contract cannot claim its benefits where he is the first to violate it.'" *Supermarket Merch. & Supply, Inc. v. Marschuetz*, 196 S.W.3d 581, 585 (Mo. Ct. App. 2006) (quoting *Forms Mfg., Inc. v. Edwards*, 705 S.W.2d 67, 69 (Mo. Ct. App. 1985)).[4]  Specifically with regard to employment contracts, Missouri recognizes "that when an employer first breaches an employment agreement before the employee allegedly violates the non-competition agreement, the employer is barred from enforcing the restrictive covenant against the employee." *Supermarket*, 196 S.W.3d at 585 (citing *Forms Mfg.*, 705 S.W.2d at 69).  Nevertheless, the breach of contract must be "material" in order for the aggrieved party to withhold performance or cancel the contract. *Premier Golf Missouri, LLC v. Staley Land Co., LLC*, 282 S.W.3d 866, 873 (Mo. Ct. App. 2009).  The question of whether or not a breach is material is "largely an issue of fact." *Forms Mfg.*, 705 S.W.2d at 69.

---

[4] The employment contracts and EPP contain "Governing Law" provisions that provide that the contracts "shall be governed and construed in accordance with the laws of the State of Missouri." (Schouweiler Dep., Ex.1 ¶ 27; *id.*, Ex. 2 ¶ 24; *id.*, Ex. 5 ¶ 12.)  Thus, Missouri law applies in determining this breach of contract dispute, which the parties do not dispute. *See Union Elec. Co. v. AEGIS Energy Syndicate 1225*, 713 F.3d 366 (8th Cir. 2013) (applying Missouri contract law because the parties agreed in the body of the contract to interpret the agreement in accordance with Missouri law).

## A.      Temporary Withholding of Commissions as Possible Breach

Defendants argue that their temporary withholding was not a breach, but rather authorized by the agreements because Schouweiler had violated the noncompete provisions by transferring Brett Cravath's accounts to New England Securities on March 3, 2011, and that there is enough evidence upon which a reasonable jury could conclude as much.[5]   Defendants point to the fact that, when Cravath's accounts were transferred to New England Securities on March 3, 2011, Schouweiler worked for Mid-America Financial, which is an affiliate of New England Securities.   They also point to the fact that Schouweiler produced during discovery for this case an undated Mid-America Financial client information form for Cravath, that Schouweiler already had a history of switching accounts to New England Securities (his daughter's and grandson's, for whom Defendants indicated they would not enforce the noncompete provisions), and that Schouweiler represented Cravath on a transfer in November 2011.

Schouweiler argues that this evidence is insufficient and that Defendants must "do more than simply show that there is metaphysical doubt as to the material facts."   (Pl.'s Reply Mem. at 2, May 21, 2014, Docket No. 41 (quoting *Matsushita*, 475 U.S. at 586-87).)   He points to his own deposition testimony that the account he opened for Cravath was not opened until November 2011, nine months after Defendants began withholding commissions.   Schouweiler argues that the fact that at that time he worked for a financial group which is affiliated with the financial group to which a Cravath account was

---

[5] The employee contracts provide that an employee's "right to receive commissions, if any, shall automatically terminate upon breach of the terms and conditions set forth in [the Covenant Not to Compete]."   (Sales Rep. Contract ¶ 8(e).)

transferred in March 2011, and the undated client information form produced in discovery are insufficient to support a reasonable jury conclusion that he was involved in transferring that particular account of Cravath's at that time.

While Defendants' evidence is essentially circumstantial, it is sufficient to withstand summary judgment. Considering Defendants' evidence as a whole, a reasonable jury could conclude that Schouweiler was involved in the March 2011 transfer of Cravath's accounts. Schouweiler worked for Mid-American Financial Group from January to May of 2011, and Schouweiler produced an undated Mid-American Financial Group form filled out with Cravath's information. Plaintiff offers no explanation for the existence of this form. (*See* Pl.'s Reply Mem. 3.) Yet, the existence of this form combined with Schouweiler's subsequent business dealings with Cravath later that year could lead a reasonable jury to conclude that Schouweiler represented Cravath on the March 3, 2011 transfer. Schouweiler's arguments to the contrary – for example, that his deposition testimony indicates that he did not open an account for Cravath until November 2011 — raise credibility issues, which are for the jury. Thus, Defendants' evidence goes beyond a mere scintilla and presents a genuine issue of material fact upon which a reasonable jury could conclude that Defendants were authorized by the agreements to withhold Schouweiler's commissions because he had violated the noncompete provisions.

**B.     Materiality**

Defendants contend that, even if they were not authorized to withhold commissions and thus breached the agreements by temporarily withholding Schouweiler's commissions, the temporary withholdings were not a **material** breach and thus did not excuse Schouweiler from further contractual obligations.  Defendants argue that the breach was not material because Schouweiler "did not lose anything as a result of the temporary holding of commissions" because the commissions were "reinstated and paid in full after a short time."  (Defs.' Mem. in Opp'n to Mot. for Summ. J. at 23, May 7, 2014, Docket No. 35.)   Furthermore, Defendants contend that the amount withheld –  $3,929.98 – "is not material when viewed in context of a twenty-four year relationship, during which Schouweiler received substantial commissions, including over $1.9 million in commissions from CNS from 1998 through 2009." (*Id.*)  Schouweiler contends that, as the primary breadwinner in his family, missing commissions for several months without any notice "was detrimental to [his] family that was relying on those monthly payments to pay their bills." (Pl.'s Reply Mem. 5.)

Schouweiler points to two Missouri cases to support his proposition that Defendants' breach was material as a matter of law.  In *Supermarket Merchandising & Supply, Inc. v. Marschuetz*, the employer instituted three unilateral changes to the employee's commission arrangement which had the effect of both shifting the risk of any customer nonpayment to the salesperson-employee and limiting the commissions paid upon termination to those accounts already paid in full by the customer.  196 S.W.3d at 583-84.  The court concluded that "the three unilateral changes to the Agreement were

material because they, first, substantially altered the manner in which [the employee] was paid, and second, affected the amount he was paid." *Id.* at 586.  After comparing its facts to other Missouri cases, the Court observed that the three changes

> substantially altered the manner in which [the employee] was paid by placing a greater risk of customer non-payment of invoices on [the employee] than originally bargained for.  In addition, Supermarket's change of the policy regarding commissions paid to terminated employees denied [the employee] approximately $24,000 in commissions that he would have been paid under the original Agreement. This policy change was clearly material to [the employee]'s overall compensation structure.

*Id.*

Schouweiler also points to *Forms Manufacturing, Inc. v. Edwards*, in which the employee agreed to be paid sixty-percent commission on all sales he made for the company.  705 S.W.2d at 69.  The employment agreement contained a covenant not to compete.  *Id.*  Later, the company unilaterally changed the contract, requiring employees to generate a monthly minimum and assessing a monetary penalty against under-producing employees.  *Id.*  The employee requested commissions that he was owed on numerous occasions, but the company withheld those commissions from him, which required the employee to borrow money from a bank to cover his expenses.  *Id.*  The court found:

> Based upon these facts, there was sufficient evidence for the court to find that the company's conduct in establishing the minimum contribution without employee's consent, and retaining employee's commissions were both a breach of contract by company, and rose to the level of unclean hands.  It follows that the trial court reasonably could have found that company was not entitled either to an injunction or to damages for employee's alleged breach of the restrictive covenant not to compete because of its own prior breach of the employment contract.

*Id.* at 69-70 (alterations and internal quotations omitted).

Neither case supports a conclusion as a matter of law that the temporary withholdings here amounted to a material breach of the agreements. Unlike in *Supermarket*, Schouweiler's overall compensation structure was not affected, but rather, his funds were put on temporary hold. Further, the total amount of money Schouweiler was paid was not affected; he received the same amount, albeit at a later date than he anticipated. *Forms* also does not require summary judgment here – in that case the Missouri Court of Appeals reviewed the Court's factual conclusions after a bench trial. *See Forms Mfg.*, 705 S.W.2d at 68. Here, however, the Court takes the facts in a light most favorable to Defendants. *Matsushita*, 475 U.S. at 587. *Forms* is also distinguishable on factual grounds. First, unlike here, the employer there unilaterally altered the employment contract, thus altering the structure of the payment arrangement. Second, the employee there showed that he had to take out a bank loan to continue paying his bills, and further showed that the company had breached the employment contract in a second way by unilaterally altering the employment contract. *Id.* at 69. Here, Schouweiler has not made such a showing as to any economic hardship that may have been caused by Defendants' withholding his commissions. He relies solely on his deposition testimony stating that he is the "primary breadwinner" of his family and the withholding of commissions "was detrimental to [his] family that was relying on those monthly payments to pay their bills." (Pl.'s Reply Mem. 5.) Taking the facts in a light most favorable to Defendants, this is insufficient for the Court to conclude as a matter of law that a temporary delay in commission payments amounted to a material breach.

The question of whether a breach is material is still largely a factual inquiry. *Forms Mfg.*, 705 S.W.2d at 69.   Viewing the evidence in the light most favorable to Defendants, a reasonable jury could infer that Defendants' breach was not material because it did not affect the overall amount Schouweiler was paid and did not substantially affect the manner in which he was paid.   *See Supermarket*, 196 S.W.3d at 586 ("[C]hanges to the Agreement were material because they, first, substantially altered the manner in which Marschuetz was paid, and second, affected the amount he was paid. We find support for this conclusion in several Missouri cases . . . .").   Thus, a genuine issue of material fact exists as to whether or not the temporary withholding of Schouweiler's commission payments amounted to a material breach of the employment contracts.   The Court will therefore deny Schouweiler's motion for summary judgment.

## III.   REMAINING ISSUES

Because the Court concludes that the parties' disputes over whether Defendants breached the agreements by temporarily withholding commissions and whether any such breach was material must be submitted to a jury, the Court need not, at this time, address the potential legal effect of any such material breach.   The Court instead leaves those issues for when the parties are preparing their strategies and approaches for trial. However, the Court observes that there is significant uncertainty – both factually and legally – about the effect of both Schouweiler's and Defendants' actions upon Schouweiler's entitlement to his EPP account funds.   Specifically, it remains unclear whether Defendants' 2012 advisement to Schouweiler amounted to a denial of a benefits

claim, such that this action is the proper mechanism for Schouweiler to seek a determination that he is entitled to such benefits.  The Court encourages the parties to be prepared to address, at a later stage in these proceedings, how an employee **should** proceed when faced with a pre-claim advisement that their funds in an ERISA account will not be paid.[6]

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment [Docket No. 24] is **DENIED**.

DATED:   September 16, 2014        ____ s/ John R. Tunheim ____
at Minneapolis, Minnesota.                   JOHN R. TUNHEIM
                                         United States District Judge

---

[6] The Court observes too, that the parties could also consider whether making EPP funds contingent upon compliance with the noncompete provision in the EPP is enforceable under ERISA or Missouri law.